```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____
                                :
MADISON REMARKETING, INC.       :
                                :
            Plaintiff,          :
                                :    99 CIV. 2026 (CLB)(MDF)
     -against-                  :    DECISION AND ORDER
                                :
                                :
EMC CORPORATION                 :
                                :
            Defendant.          :
_____:
```

Brendan Lynch, Barry Williams and Eastern Computer Exchange, Inc. (collectively the "Petitioners") move for civil contempt and/or sanctions against EMC Corporation, Inc. (the "Defendant" or "EMC") for violating a protective order entered by this Court on October 12,1999 (the "Protective Order"). The Defendant opposes this motion. For the reasons stated below, the Petitioner's motion is denied.

## I. *BACKGROUND*

This lawsuit originally involved a dispute between the Defendant, a supplier of computer storage equipment, and one of its re-sellers, Madison Remarketing, Inc. ("Madison"). During discovery, Madison subpoenaed three of Eastern Computer Exchange, Inc. ("Eastern")'s principals, Frances M. Keaney, Barry Williams and Brendan Lynch, to testify as to the nature of the relationship between Eastern and EMC. At this time, Eastern was a re-seller of EMC equipment and a competitor of Madison.

On October 7, 1999, Keaney and William's depositions were taken. Five days later, on October 12, 1999, as Lynch was being deposed a dispute arose between Martin Conrad, counsel for Plaintiff, and William Andrew Lichtenfels, counsel for Eastern, regarding the confidentiality of information about whether or not Eastern restores equipment after purchasing it. Lynch Deposition ("Lynch Dep.") at pgs. 36-37. Mr. Lictenfels stated that this information:

> goes to proprietary business practice. My client assumes that when they purchase equipment, they may or may not have to do things with that equipment in order to give it value to bring it to market. This individual's question directly bears on the corporate strategy . . .

October 12, 1999 Hearing Transcript (Oct. 12, 1999 Tr.) at pg. 7, lines 15-21.

To resolve this dispute I stated the following:

> . . . I am entering on the record an order of confidentiality which consists of the following: Any information of a proprietary or commercial value in nature that is elicited at this deposition is to be used solely for the purpose of representing these clients in this lawsuit filed in this case under this docket number and for no other purpose.
>
> Any non-parties in the room - and this goes for party representatives as well – if any such confidential information is designated, all parties and anyone else in the room is to be advised of the order that I have issued and is to be bound by that order.
>
> If any of this information turns up anywhere else, it will be the burden of the party using that information to come forward with proof of another source of that information. This order is backed by the full contempt authority of this court. It applies to counsel, it applies to everyone. Any further questions?

2

Id. at pg. 8, lines 10-25, pg. 9, lines 1-2.

To which Mr. Lichtenfels stated:

> Only, Your Honor, that some of the information that's disclosed relative to business practice is not susceptible, necessarily, to the confines or parameters of such an order. In fact, business practices, Your Honor, have to do with the creativity of the individuals who bring those practices on the market.

Id. at pg. 9, lines 3-8.

To which, I responded:

> Mr. Lichtenfels, I am not going to sit here and tell you that I disagree with you. The problem I have here is that information which is sought at least at first blush appears that it might lead to the discovery of relevant information. Now if you've got something that your client thinks is so crucial I will direct that everyone leave the deposition room and the only parties left in the deposition room will be counsel that will include parties -- I'll exclude parties from the deposition room -- and no one is to disclose that information to anyone including not to their own clients. If after counsel get the information they think the information is relevant for further use in this litigation, they can make an application to me and I'll make a determination as to whether it goes any further.

Id. at lines 9-23.

Since Lichtenfels never asked to exclude parties from Lynch's deposition[1] or made an application to the Court to broaden the Protective Order, the Order was limited to protecting disclosure of the information contained in the last thirty pages of the

---

[1] Petitioners claim that the record reflects that Larry Markowitz, Madison Remarketing representative, was ejected from the deposition following the Protective Order. However, all the record reflects is that Mr. Markowitz "left the room" and there is nothing to suggest that he was ejected at Lichtenfeld's request. Nevertheless, no application was ever raised and thus the reason for Markowitz leaving is of no consequence to the current issue.

3

Lynch deposition which was "of a proprietary or commercial value ...". Id. at pg. 8, lines 12-13.

In fall 2003, Keaney's relationship with the two other principals of Eastern began to deteriorate. Allegedly, Keaney asked William Raferty, a former colleague of his and the Vice President of Market and Sale Engagement for EMC, for copies of the transcripts from his deposition and the depositions of Lynch and Williams. According to Keaney, the purpose of him asking for these transcripts was to see if Williams or Lynch had acknowledged in their testimony that he was a principal of the company and entitled to one-third of the profits. *See* Petitioners Reply Memorandum (Pet. Reply Mem.) at Ex. 2, pgs. 34-36.

On November 5, 2003, Keaney filed a federal lawsuit in the District of Connecticut against Eastern, Lynch and Williams alleging, *inter alia,* that Petitioners failed to pay him what he was owed as a principal of Eastern. On January 12, 2004, Petitioners moved to dismiss the Complaint under Fed. R. Civ. P. Rules 12(b)(1) and 12(b)(6). In support of this motion, Petitioners submitted affidavits from Lynch and Williams, both of which stated that "[a]t no time did Keaney ever become a shareholder or owner of Eastern." Certification of A. Ross Pearlson, Exhibit ("Ex.") E & F.

In February 2004, Keaney filed papers in opposition and attached the Lynch and Williams deposition transcripts from the

4

*Madison Remarketing* case. In his opposition papers, Keaney notes that:

> Williams and Lynch are either lying to this Court [the District Court in Connecticut] or were lying to the U.S. District Court for the Southern District of New York [in the Madison Remarketing case].

Id. at Ex. G at pg. 6. At the time the Petitioners made no objections to Keaney's submission of Lynch's and Williams' deposition and never moved to strike or seal the transcripts.

In November 2004, Keaney again submitted portions of the Lynch deposition, this time in connection with his motion for a protective order. Id. at Ex. H. Again, Eastern raised no objection and did not move to strike or seal the transcripts. Id. at Ex. I.

In March 2005, Petitioners filed this motion stating that Lynch's deposition transcript contained proprietary or commercial information and thus the Defendant was subject to sanctions since the entire *Madison Remarketing* Lynch deposition was released to Keaney. In addition, Petitioners assert that even if the Lynch transcript did not contain proprietary or commercial information, "that none of the information contained in [the second half of the Lynch Deposition] should have been disclosed to anyone, without further Order of this Court" and thus EMC violated the Protective Order. Petitioners' Post Hearing Memo. ("Post Hearing Memo.") at pg. 5. The Defendant opposes this motion claiming

that (a)Lynch's deposition transcript did not contain any commercial or proprietary information and (b) Petitioners waived their claim that the transcript was subject to a Protective Order when they disclosed the transcript to Keaney and did not object when Keaney filed the transcript with the United States District Court in Connecticut in February 2004. Defendant's Memorandum in Opposition (Def. Memo. at pgs. 4-5).

## II. *DISCUSSION*

A contempt order is a "potent weapon" which a court should not issue if "there is a fair ground of doubt as to the wrongfulness of the defendant's conduct." *King v. Allied Vision, Ltd.,* 65 F.3d 1051, 1058 (2d Cir. 1995)(citing *International Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n,* 389 U.S. 64, 76, 88 S.Ct. 201,208, 19 L.Ed.2d 236 (1967). A court should only exercise this power "if the moving party establishes by clear and convincing evidence that the alleged contemnor violated the district court's edict." Id. Specifically, the movant must establish that (1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of non compliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner. *New York State Nat'l Org. for Women v.* Terry, 886 F.2d 1339,1351 (2d Cir. 1989); *EEOC v. Local 638, Local 28 of Sheet Metal Workers' Int'l Ass'n,* 753

F.2d 1172,1178 (2d Cir.1985), *aff'd,* 478 U.S. 421, 106 S.Ct. 3109, 92 L.Ed.2d 344 (1986).

An order is clear and unambiguous if it "leaves no uncertainty in the minds of those to whom it is addressed [and] who must be able to ascertain from the four corners of the order precisely what acts are forbidden." *King v. Alied Vision Ltd.,* 65 F.3d 1051,1058 (2d Cir.1995)(quoting *Hess v. New Jersey Transit Rail Operations, Inc.,*846 F.2d 114,116 (2d Cir.1988). Since an order is to be construed as a contract for enforcement purposes, "reliance upon certain aids of construction is proper, as with any other contract." *A.V. by Versace, Inc. v. Gianni Versace, S.p.A.,* 87 F.Supp.2d 281, 291 (fn 15)(S.D.N.Y.2000)(citing *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 238, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975)(footnote omitted). Such aids include reviewing (1) the circumstances surrounding the formation of the consent order, (2) the meaning that words used may have had to the parties and (3) any other documents expressly incorporated in the decree. Id.

Here, the Protective Order was sufficiently clear as to what testimony was not to be disclosed. It prohibited any party or non party in this action from using "[a]ny information of a proprietary or commercial value in nature" that was contained in the last thirty pages of Lynch's deposition transcript for any purposes outside this litigation. I stated on the record that

7

"if any of this information turns up anywhere else, it will be the burden of the party using that information to come forward with proof of another source of that information." Oct. 12, 1999 Tr. at pg. 8, line 22-24. After the Protective Order was entered Mr. Lichtenfels voiced his concern that "some of the information that's disclosed relative to [Madison's] business practice is not susceptible necessarily, to the confines or parameters of such an order." Id. at pg. 9, line 3-6. To ease his concern, I told Mr. Lichtenfels that if a question asks for information that his "client thinks is so crucial", I "direct that everyone else leave the deposition room" and for him to make an application to this Court and I will make a determination as to whether to expand the Protective Order to include the information contained in the answered question. Id. at line 15-23.

Although the Protective Order was specific enough to serve as the foundation for a contempt citation[2], I find that the Petitioners have not proved by clear and convincing evidence that the second half of the Lynch deposition transcript contained proprietary or commercial information. As the Defendant

---

[2] I note that even if I assume, arguendo, that the Petitioners are correct that the Protective Order is broader in scope than I intended, I still could not find Defendant in civil contempt. Petitioners assert "that the entire portion of Brendan Lynch's deposition that followed the entry of the Court's order was . . . subject to this Court's Order." However, if this is the case, then it is far from clear, whether, and to what extent, the Protective Order applies to any of the information contained in the Lynch deposition, and the Petitioner's motion must be rejected because the Protective Order was not clear and unambiguous on that point.

8

accurately assets, the Petitioners' papers "attempt to claim, through a series of conclusory allegations and tautological arguments that certain subjects discussed in the last thirty pages of the Lynch deposition consist of commercial or proprietary information." EMC's Supplemental Memorandum of Law ("Def. Memo.") at pg. 5. For example, the Petitioners argue that the following questions elicited proprietary information:

> Q: Did Frank Keaney own any portion of your company?
>
> Mr. Lichtenfels: Objection. That is outside the stipulation. You can answer.
>
> A: Frank is an owner.
>
> Q: Does he own 1/3 of your company?
>
> Mr. Lictenfels: Objection. You can answer.
>
> A: Yes.
>
> Q: Does he own 1/3 of the stock of your company?
>
> Mr. Lichtenfels: Objection. You can answer.
>
> A: No.
>
> Q: Is his ownership confined to having the right to participate in 1/3 of the profits of your company?
>
> Mr. Lichtenfels: Objection. You can answer.
>
> A: Yes.
>
> Mr. Lictenfels: I want to make a statement for the record.
>
> Mr. Conrad: Sure.
>
> Mr. Lichtenfels: Martin, I'm losing my patience with this.

> Mr. Conrad: That's all right.
>
> Mr. Lictenfels: That is not okay.

Lynch Dep. at pgs. 63-64.

Specifically, Petitioners assert that "there is nothing more proprietary than the ownership of a closely-held corporation." Post Hearing Memo. at pg. 7. For support they cite to various cases which define the term proprietary rights as the rights one has as a consequence of owning a piece of property, and then make an analogy that if the terms are synonymous any information having to do with ownership would be under the purview of the Protective Order. *See* Id. at pgs. 7-8. However, whether terms "proprietary" and "ownership" mean the same thing is not determinative of whether the identities of the owners of Eastern is truly proprietary information. In addition, Petitioners also cite to *Public Service Co. v. Blue River Irrigation Co.*, 753 P.2d 737,739 (1988) which they claim proves that the "disclosure of identities of shareholders is confidential". Id. at pg. 8. However that case as the Defendant accurately asserts " . . . is a water rights case decided under Colorado law" and " . . . not binding on this Court and inapposite in any event." Def. Memo. at pg. 6, footnote 3. In *Public Service Co.,* the water court sustained an objection to the disclosure of the identities of the shareholders because the identity of shareholders are confidential under Colorado corporate law. However, the Supreme

Court of Colorado reversed the water court's finding and held that the shareholders' identities were discoverable, admissible and not privileged. Id. at 742. *See also, Nova Products, Inc. v. Kisma Video Inc.,* 220 F.R.D. 238,241 (S.D.N.Y. 2004)(court denied motion to quash non-party subpoena seeking documents over disputed ownership of one of defendant's corporations, finding that there was no evidence that the dispute over ownership involved confidential or commercial information.)

In addition, Petitioners list the following portions of the Lynch deposition transcript concerning a series of general business practices and claim that they relate to confidential, proprietary business information:

> EMC Ex. C at 48, line 13 (questioning about equipment refurbishing business practices); EMC Ex. C. At 50-52 (questioning concerning Eastern's sale of equipment at a profit); EMC Ex. C at 53, line 7-55, line 4 (questioning concerning timing of Eastern's purchases of EMC equipment); EMC Ex. C at 56, line 6-57, line 3 (questioning concerning arrangements with venders whereby vendors would guarantee Eastern payments from EMC to Eastern); EMC Ex. C at 68, line 14-15 (questioning about payment practice); EMC Ex. C at 70, line 21-72, line 4 (questioning concerning Eastern's practices in paying venders).

Post Hearing Memo. at pg. 9.

However, again they provide no insight on how this information is used in Eastern's business or how this information would give them an opportunity to obtain an advantage over competitors who were unaware of this information. For example, a customer list is deemed confidential commercial information only "if the names

. . . are not 'readily ascertainable' from sources outside an employer's business." *See DDS, Inc. v. Lucas Aerospace Power Transmission*, 182 F.R.D. 1, 4 (N.D.N.Y. 1998)(citing *FMC Corp. v. Taiwan Tainan Giant Indus. Co., Ltd.,* 730 F.2d 61,63 (2d Cir.1984).

In this Circuit, courts tend to look at the definition of trade secrets provided in the Restatement of Torts §757, comment (b)(1939), when determining whether information is proprietary or commercial. "A trade secret may consist of any formula, pattern, device, or compilation of information used in one's business, and which gives him an advantage over competitors who do not know or use it." Id.  Six factors used to help courts ascertan whether information is a trade secret are as follows: (1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) measures taken to guard the secrecy of the information; (4) the value of the information to the holder and his competitors; (5) the amount of effort or money to develop the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *DDS, Inc.,* 182 F.R.D. at 5; *United States v. International Business Machines Corp.,* 67 F.R.D. 40,47 (S.D.N.Y.1975).

Here, absent from Petitioners' papers is any explanation, by way of affidavit or otherwise, as to how any of the information

actions belie their current claim, since a number of the topics covered in the last thirty pages of the Lynch deposition were also the subject of testimony in the Williams and Keaney depositions. For example, all three deponents testified that Keaney was an owner of Eastern. Likewise, Williams, Keaney and Lynch all testified that Eastern generally made a profit on the resale of the equipment, although there were no guarantees. Curiously, however, despite the similarity of the testimony, Eastern did not ask this Court to issue a protective order designating any portion of Williams' or Keaney's depositions as "confidential."

## V. CONCLUSION

For the foregoing reasons, the Petitioner's motion is denied.

SO ORDERED
Date: July 28, 2005
White Plains, New York

_____
MARK D. FOX
UNITED STATES MAGISTRATE JUDGE

Copies of the foregoing report and recommendation have been sent to the following:

A. Ross Pearlson, Esq.
Sills Cummis Epstein & Gross
The Legal Center
One Riverfront Plaza
Newark, NJ 07102-5400

William Andrew Lichtenfels, LLC
29 Water Street
Guilford, CT 06437